UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THERESA ROMANO, L.R. BLAKE TRUST, and CONCETTA ROMANO | ) ) ) |
| Plaintiffs | ) Civil Action No. ) 03-12626MLW |
| v. | ) ) |
| ARBELLA MUTUAL INSURANCE CO., | ) ) |
| Defendant | ) ) |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to F.R.C.P. 56(b), Defendant Arbella Mutual Insurance Co. ("Arbella") has moved for summary judgment as to the Plaintiffs' claims. As grounds for summary judgment, Arbella argues that the Plaintiffs 1) have failed to cooperate by not providing requested financial documents which are material to a determination on the claim; and 2) have concealed and/or misrepresented information pertinent to the investigation of the claim.

Accordingly, Arbella seeks summary judgment dismissing the Plaintiffs' claims. In support of its motion, Arbella states as follows.

### STATEMENT OF FACTS

There is no genuine dispute concerning the following material facts, which are taken from the pleadings, affidavits, and the examination under oath in this matter.

On August 28, 1984, Concetta Romano ("Concetta") executed a document giving her sister, Theresa Romano ("Ms. Romano" or "Theresa Romano"), durable power of

attorney over Concetta's affairs. Exhibit A to Affidavit of Lewis C. Eisenberg, dated August 3, 2004, at ¶ 2 (hereinafter "Eisenberg Aff. ¶ __, Exh. __").

On September 19, 1984 Ms. Romano and Concetta created a trust called the L.R. Blake Trust (the "Trust"). Exhibit 1 and p. 14 of Examination under Oath of Theresa Romano dated July 24, 2002, attached as Exhibit B to Eisenberg Affidavit (hereinafter "Eisenberg Aff. ¶ 3, EUO, p. __, Exh. __"). The trust documents name Concetta as the sole beneficiary and the sole trustee. Id. The durable power of attorney given to Ms. Romano on August 28, 1984 included the rights and duties associated with administering the trust and its property. [1] Eisenberg Aff. ¶ 2, Exh. A.

Immediately after creating the trust on that same day (September 19, 1984), Theresa and Concetta Romano transferred to the Trust for a nominal consideration of $1.00 their tenants-in-common ownership interests in 49 Bowdoin Avenue, Boston, MA (the "Subject Premises" or the "house"). Eisenberg Aff. ¶ 3, EUO, p. 14, Exh. 2.

On August 5, 2001, Arbella issued a policy of fire insurance (No. 83217400000) to the Trust. Eisenberg Aff. ¶ 4, Exh. C. This policy pertains to certain property owned by the Trust of which Concetta Romano was the Trustee; coverage is set forth in the policy documents themselves. Complaint ¶ 8; Answer ¶ 8.[2]

On October 17, 2001, Arbella issued a policy of fire insurance (No. 03234400001) to Theresa Romano. Eisenberg Aff. ¶ 5, Exh. D. This policy pertains to certain personal property owned by Theresa Romano; coverage is set forth in the policy documents themselves. Complaint ¶ 8; Answer ¶ 8.

---

[1] At all times relevant to this litigation, Theresa Romano is held to represent the interests of all the Plaintiffs in this action as she has durable power of attorney over her sister and is thus *de facto* trustee of the L.R. Blake Trust.
[2] References to pleadings are those filed in this case.

As set forth the documents of these two policies, the property at issue in this case was and is located at the Subject Premises. Complaint ¶¶ 7, 10. These two policies were in effect on or about January 1, 2002. Complaint ¶ 8; Answer ¶ 8. These two policies included standard language as required by Massachusetts statutory law. M.G.L. c. 175, § 99. In particular, the following provisions in these two policies constitute the operative language relied upon in this motion (the language has been highlighted in the respective policy specimens that are attached):

- [The insured must] . . . [a]s often as we, [Arbella], may reasonably require: . . . provide us with records and documents pertinent to the loss and permit us to make copies. (This language is identical for both policies).

- We provide no coverage for loss under Section I --- Property Coverages if, whether before or after a loss, one or more "insureds" have: 1) intentionally concealed or misrepresented any material fact or circumstance; 2) engaged in fraudulent conduct; or 3) made false statements; relating to this insurance. (This language is contained in the policy issued to the Trust).

- This entire policy will be void if, whether before or after a loss, the "insured" has: 1) intentionally concealed or misrepresented any material fact or circumstance; 2) engaged in fraudulent conduct; or 3) made false statements; relating to this insurance. (This language is contained in the policy issued to Ms. Romano).

- Unless otherwise provided in writing, we shall not be liable for loss caused by fire or lightning occurring while a described building is vacant, whether intended for occupancy by owner or tenant, beyond a period of 60 consecutive days for residential purposes [sic., should be "for residential *premises*"] of three units or less and 30 consecutive days for other residential purposes [sic., should be "other residential *premises*"]. (This language is contained in the policy issued to the Trust).

Eisenberg Aff. ¶¶ 4, 5, Exhs. C, D. The Plaintiffs, Theresa and Concetta Romano, also own properties in New Hampshire. Eisenberg Aff. ¶ 3, EUO, p. 33-37. They claim to spend at least forty percent of their time living in New Hampshire. Id.

In February 2000, Ms. Romano, as trustee of the L.R. Blake Trust, decided to put the Subject Premises up for sale. Affidavit of Julie Simmons, dated July 29, 2004, at ¶ 1 (hereinafter "Simmons Aff. ¶ 1"). At Ms. Romano's urging the listing price was $189,900. Affidavit of Lee Coady, dated August 2, 2004, at ¶ 1 (hereinafter "Coady Aff. ¶ 1"). The listing agent was Lee Coady. Id. Mr. Coady has stated under oath that he thought the listing price for the Subject Premises was at least $40, 000 overpriced due to the condition of the house. Id. Offers to buy the house came in around the $150,000 range. Simmons Aff. ¶ 1.

While the Subject Premises were on the market, Julie Simmons, a realtor working with Mr. Coady, visited the house and stated under oath that "[w]hen I saw the house it appeared the house was not lived in for a very long period of time. There did not seem to be enough furniture in the house to indicate that someone lived there recently." Simmons Aff. ¶ 1. Ms. Romano told Ms. Simmons that she was not living at the house while it was on the market, but was staying with friends in Quincy, MA. Id. Ms. Romano also made representations to the brokers that a caretaker, an older gentleman name Levon Boudre ("Mr. Boudre") was living in the lower level of the house. Simmons Aff. ¶ 1; Coady Aff. ¶ 1. When the brokers wanted to show the house they would call Mr. Boudre and ask him to vacate    Simmons Aff. ¶1; Coady Aff. ¶ 1.

Later, in the spring of 2001 Ms. Romano returned to the realty office to see if she should raise the price, and stated to Ms. Simmons that the property was still vacant. Ms. Simmons stated under oath that she "[s]pecifically asked [Ms. Romano] if the house was vacant because I told her that the house would be more desirable if it was vacant. Ms. Romano assured me that the house was vacant at the time." Simmons Aff. ¶ 1.

During the examination under oath, Ms. Romano, in a response to a question about who lived at the Subject Premises stated that no one else had ever lived there:

4

Q: When you go to New Hampshire, do you have any caretaker who stays at the house on Bowdoin?

A: You know, that is something that I want to clear up, and I want to clear that up carefully. No one has ever lived in our house at Bowdoin Avenue other than my mother and father and my sister and I.

Eisenberg Aff. ¶ 3, EUO, p. 38. Also during the examination under oath, Ms. Romano

stated that she assumed that Mr. Boudre lived in Roxbury or Dorchester. Eisenberg Aff.

¶ 3, EUO, p. 46. And when questioned further about her relationship with Mr. Boudre,

Ms. Romano stated that

[m]y sister and I were brought up to have --- we are honorable women and we are women of great virtue, and I don't like this implication that some man was living in my house, this Bowdoin Avenue, and came up and stays with me and my sister in Nashua. I deeply resent that. I resent that beyond. I mean no one can understand it. If one has lived a life of great virtue, I want it honored.

Eisenberg Aff. ¶ 3, EUO, p. 51.

Turning to the night of the fire, the night December 31, 2001/January 1, 2002,

Ms. Romano stated under oath that she and her sister left the Subject Premises after

spending the day there. Eisenberg Aff. ¶ 3, EUO, p. 64-84. They left at 11:30 p.m. on

New Years Eve to go to First Night events and then go to New Hampshire. Id. at p. 65.

Ms. Romano said she started to get a severe headache during the drive. Id. at p. 74. So

she drove to Carney Hospital's emergency room. Eisenberg Aff. ¶ 3, EUO, p. 74. She

went in, but Concetta would not come in with her. Eisenberg Aff. ¶ 3, EUO, p. 76. The

hospital guards and nurses tried to get Concetta to come in, but she refused any

assistance. Eisenberg Aff. ¶ 3, EUO, p. 75. Concetta sat in the car for approximately

four hours while Ms. Romano was in the emergency room. Id.

After Ms. Romano left the emergency room she went to wait in the car with her

sister. Eisenberg Aff. ¶ 3, EUO, p. 76-79. They did not want to drive the car because

Ms. Romano believed there might have been something wrong with the brakes. Id. They

waited in the car all day, until 6 p.m. that night. Id. During her lengthy time in the car, Concetta "had urinated three or four times, and done her other business in the car," and "refused to have a wheelchair to bring her to the restroom." Eisenberg Aff. ¶ 3, EUO, p. 77. Around 4 p.m. they called someone to drive them up to New Hampshire. Eisenberg Aff. ¶ 3, EUO, p. 79.

Carney Hospital is 2.2 miles and approximately a seven-minute drive from the Subject Premises.

Meanwhile the fire occurred at the Subject Premises sometime while the sisters were out. Eisenberg Aff. ¶ 3, EUO, p. 79-85. The Boston Fire Department conducted an investigation and has made preliminary findings that the fire was caused by arson. Eisenberg Aff. ¶ 6, Exh. E. In investigating the arson, a Boston City arson investigator called Ms. Romano to inform her about the fire and to ask her to meet him for questioning. Eisenberg Aff. ¶ 3, EUO, p. 83-86. Ms. Romano told the investigator that she wanted a lawyer present for any questioning, whereupon she called and engaged Dane Shulman's law offices. Id.

Arbella was notified of the loss and began its own investigation which has also led to the preliminary conclusion that the fire was a result of arson. Eisenberg Aff. ¶ 9, Exh. H at p. 2. As part of its investigation Arbella conducted an examination under oath of Ms. Romano. Eisenberg Aff. ¶ 3, Exh. B. As part of the examination under oath Arbella requested certain documents, in particular financial and utility bills for investigatory reasons, one of which was to determine if the Subject Premises were vacant for more than 60 days prior to the fire. Schedule A of Eisenberg Aff. ¶ 3, EUO, p. 63, Exhs. 6, 7.

Ms. Romano did not provide the requested documents at the time of the examination under oath. Eisenberg Aff. ¶ 3, EUO, p. 60. Based upon the objection of

Mr. Shulman, she refused to provide financial information when it was specifically asked of her at the examination. Eisenberg Aff. ¶ 3, EUO, p. 55-60. Arbella again requested, by a September 9, 2002 letter, the materials that were not provided at the examination. Eisenberg Aff. ¶ 8, Exh. F. Neither Ms. Romano nor Mr. Shulman has given any basis for the refusal to cooperate. Eisenberg Aff. ¶¶ 7-8. By letter of October 1, 2002, Arbella further urged that Ms. Romano cooperate and provide the requested financial information. Eisenberg Aff. ¶ 8, Exh. G. Mr. Shulman never responded to this letter. Eisenberg Aff. ¶ 8.

On March 7, 2003, Arbella disclaimed coverage on grounds on non-cooperation and misrepresentation/concealment. Eisenberg Aff. ¶ 9, Exh. H.

Plaintiffs filed a civil action against Arbella in federal court for breach of contract and unfair trade practices. Arbella has filed an answer and now moves for summary judgment on all counts.[3]

## **ARGUMENT**

### **Summary of Argument**

The Plaintffs' have a duty to cooperate under both the terms of the policy and statutory law, c. 175, § 99. They have failed to fulfill that duty to cooperate by failing to provide reasonably requested documents and by concealing material information, especially in light of the highly suspicious circumstances and events of the New Year's Eve and Day when the fire occurred.

---

[3] This summary judgment argument pertains directly to Count I, the breach of contract claim, but Arbella also argues that Count II, the unfair trade practices claim, will necessarily fail if Count I fails since "as a general rule, an insurance company does not act unfairly or deceptively ... with respect to a claim made under a policy of insurance simply by making a legally correct disclaimer of coverage." Employers Insurance of Wausau v. George, 41 Mass.App.Ct. 719, 729, 673 N.E.2d 572, 579-80 (1996); see also, Jet Line Services, Inc. v. American Employers Insurance Co., 404 Mass. 706, 717, 537 N.E.2d 107, 114-16 (1989).

**Summary Judgment Standard of Review**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir.1990) (quoting Fed.R.Civ.P. 56 advisory committee's note). Thus, summary judgment is appropriate as long as "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also, Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc., 332 F.3d 6, 12-13 (1st Cir. 2003).

A motion for summary judgment should be granted in favor of the defendant when the evidence, taken in the light most favorable to the non-moving party, shows that there is no genuine issue of material fact and that the defendant is entitled to judgment as a matter of law. Local 369 Utility Workers v. NSTAR Elec. and Gas Corp., 317 F.Supp.2d 69, 72 (D.Mass. 2004), citing Rocafort v. IBM Corp., 334 F.3d 115, 119 (1st Cir. 2003).

Here, the evidence, in the light most favorable to the Plaintiffs, amply demonstrates that the Plaintiffs have breached the policy by failing to provide reasonably and repeatedly requested documents and by concealing material information about the history of the occupancy of the house and the involvement of Mr. Boudre.

**I.      As a matter of law, the policy is void for non-cooperation since the Plaintiffs failed to provide reasonably requested financial documents.**

The Plaintiffs in failing to provide reasonably requested documents have materially breached the terms of the policy and therefore the policy is void. See Rymsha

v. Trust Insurance Co., 51 Mass.App.Ct. 414, 746 N.E.2d 561, 562-65 (2001); Mello v.
Hingham Mutual Fire Ins. Co., 421 Mass. 333, 656 N.E.2d 1247, 1249-52 (1995). An
insured has duty to cooperate regarding a claim for loss by fire both under the terms of a
Massachusetts fire policy and as a matter of statutory law, c. 175, § 99. Mello, 656
N.E.2d at 1249-50. This duty to cooperate includes the duty to submit to an examination
under oath as provided for in the policy. Id. As part of duty to submit to an examination
under oath, the insured has duty to provide any requested documents that are relevant to
the claim and not privileged. See Rymsha, 746 N.E.2d at 562-65; Mello, 656 N.E.2d at
1249-52.

　　　This duty to submit to examination under oath is a duty that the courts strictly
construe. Mello, 656 N.E.2d at 1250 ("It is the law in most jurisdictions that the
submission to an examination, if the request is reasonable, is strictly construed as a
condition precedent to the insurer's liability. . . . This court agrees with these
authorities.") (citations omitted). As the provision of documents in connection with the
examination under oath constitute part of the duty to submit to examination, then it, too,
is strictly construed as a condition precedent to the insurer's liability. See Rymsha, 746
N.E.2d at 563 ("We see no basis for a distinction between an obligation to submit to a
reasonably requested examination under oath and the duty to produce documents
pertinent to the claimed loss.").

　　　In Mello, the court held that a failure to submit fully to examination under oath,
even in light of self-incrimination concerns, voided the insurance policy. Mello, 656
N.E.2d at 1249-52. Similarly in this case, the Plaintiffs failed to provide the reasonably
and repeatedly requested documents, and thus failed to fulfill the examination under oath

as a strictly construed condition precedent to Arbella's liability. See Rymsha, 746
N.E.2d at 562-65; Mello, 656 N.E.2d at 1249-52. Arbella gave them at least three
chances to cooperate and indicated the significance of their cooperation. In each
instance, the Plaintiffs refused to provide the information and did not even provide a
good faith basis for the refusal. Eisenberg Aff. ¶¶ 7-8. The Plaintiffs, therefore, failed to
fulfill their duty to submit to examination, and Arbella thus properly disclaimed
coverage. See Rymsha, 746 N.E.2d at 562-65; Mello, 656 N.E.2d at 1249-52.

Assuming *arguendo*, that prejudice must be shown, in this case Arbella has made
the required showing. See Rymsha, 746 N.E.2d at 564. Refusal to provide reasonably
requested financial documents to the insurer establishes a presumption of prejudice. See
id. In Rymsha, the defendant insurer requested personal and corporate financial
documents, including tax returns. Rymsha, 746 N.E.2d at 564. The court noted the
extensive list of jurisdictions that "have held that the financial status of an insured can be
relevant to an insurer's investigation to a claim." Id. More particularly, the court in
Rymsha addressed the prejudice issue as follows:

> We think the prejudice to [the insurer] too obvious to warrant discussion. It is
> enough to state that Rymsha's [the insured] blanket refusal to provide the
> reasonably requested documents even stymied the insurer's ability to show actual
> prejudice.

746 N.E.2d at 564.

Similarly, here the Plaintiffs have made a blanket refusal to provide the
documents that are reasonably necessary to establish whether the Plaintiffs may have had
any involvement in or knowledge of the suspected arson that caused the loss and/or
whether the occupancy provision of the policy has been met. By not providing the
documents, the Plaintiffs have put Arbella, just like the insurer in Rymsha, "in the

untenable position of either paying the claim without question and without any means by which to investigate its validity, notwithstanding the circumstances and amount of the loss described in her unsworn statement and examination under oath testimony, or being sued for breach of contract and unfair acts and practices." 746 N.E.2d at 564.

The Plaintiffs argue that the documents requested were destroyed by fire and that the burden is on the insurer to obtain the documents, once authorized by the Plaintiffs, from the respective banks and utility companies. This is incorrect as a matter of law and as a matter of practicality. See Rymsha, 746 N.E.2d at 562-65; Mello, 656 N.E.2d at 1249-52. As a matter of law the burden is on the insured to provide the documents. See id.; Eisenberg Aff. ¶¶ 4, 5, Exhs. C, D ("In case of a loss to covered property *you [the insured] must see that the following are done*: . . . . [a]s often as we [Arbella] reasonably require*: . . . provide us with records and documents* we request and permit us to make copies.") (Emphasis added). The reasoning in Rymsha and Mello clearly indicate that the duty is the insured, not the insurers. See Rymsha, 746 N.E.2d at 562-65; Mello, 656 N.E.2d at 1249-52. Merely representing a willingness to provide the documents is not sufficient. See id. The insured must actually provide the documents for that is the whole point of the request. See id.

Moreover as a matter of practicality the burden to provide the documents should be on the insured since it is a) only the insured that knows which companies and banks to direct the requests for the materials and b) only the insured that can efficiently and legally gain access to those documents.

As a final note on this first argument, Arbella draws the Court's attention to the last section of the Rymsha case, which explicitly states that the proper remedy for a

failure to provide reasonably requested documents in violation of the duty to cooperate is dismissal, rather than another opportunity to provide the requested information. Rymsha, 746 N.E.2d at 564-65. As in Rymsha, the Plaintiffs are "not entitled to a judicial test-run on the issue of the reasonableness of [the insurer's] requests for information" because that would encourage policy-holders to delay cooperation until a Court issues an explicit order requiring that they provide the documents. See Rymsha, 746 N.E.2d at 564-65.

**II.    As a matter of law, the policy is void for non-cooperation because the Plaintiffs have failed to explain adequately the occupancy (or lack thereof) of the Subject Premises and Mr. Boudre's involvement.**

The Plaintiffs have made misleading statements that breach and thus void the policy. Baker v. Commercial Union Ins. Co., 382 Mass. 347, 416 N.E.2d 187, 189-90 (1981) (coinsured's involvement in arson was directly relevant to the determination of the claim); Williams v. Travelers Ins. Co., 330 Mass. 476, 115 N.E.2d 378, 379-81 (1953) (court held misleading statements after loss voided a policy because they breached the cooperation clause); Ashline v. Genesee Patrons Cooperative Ins. Co., 224 A.D.2d 847, 638 N.Y.S.2d 217 (App.Div. 1996) (in a case involving arson, court held that concealment of financial information constitutes grounds for finding a breach of the cooperation clause).[4]    Concealment of material fact voids a fire insurance policy under the terms of fire policies as specified by c. 175, § 99, the pertinent portion of which follows:

> This entire policy shall be void if, whether before or after a loss, the insured has willfully concealed or misrepresented any material fact or circumstance

---

[4] The Massachusetts fire insurance policy law, c. 175, § 99 is based on the New York "standard policy" fire insurance law. Much of the language in the two statutes is identical, and Massachusetts courts have interpreted the Massachusetts statute in light of New York precedent. In-Towne Restaurant Corp. v. Aetna Casualty and Surety Co., 9 Mass.App.Ct. 534, 402 N.E.2d 1385, 1389 (1980) (noting the New York origins of c. 175, § 99 and that nine of the twenty paragraphs in the two statutes are identical and six are similar).

concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto.

The above language from the statute clearly states concealment and misrepresentation is grounds for voiding the policy. Id. A fact or circumstance is material is it is likely to change the insurer's decision as to whether the loss is covered. See Darcy v. Hartford Ins. Co., 407 Mass. 481, 554 N.E.2d 28, 33 (1990) (whether a fact or circumstance is material depends on whether it frustrated the underlying purpose of the contract requirement).

Here, the concealed facts constitute a breach of the policy's provisions as they material to whether the house was occupied for the 60 days prior to the fire and as to whether Mr. Boudre or someone else had access to the house to start the fire. Eisenberg Aff. ¶ 3, EUO, p 37-38; Simmons Aff. ¶ 1; Coady Aff. ¶ 1. The concealed circumstances of the house's occupancy, thus bear directly on whether the provisions of the policy have been satisfied such that Arbella should pay the claim. See Rymsha, 746 N.E.2d at 562-65; Darcy, 554 N.E.2d at 32-33.

Ms. Romano stated in her examination under oath that no one else lived at the home:

Q: When you go to New Hampshire, do you have any caretaker who stays at the house on Bowdoin?

A: You know, that is something that I want to clear up, and I want to clear that up carefully. No one has ever lived in our house at Bowdoin Avenue other than my mother and father and my sister and I.

Eisenberg Aff. ¶ 3, EUO, p 38. Yet, two realtors have stated that Mr. Boudre lived at the house at least during the time it was on the market. Simmons Aff. ¶ 1; Coady Aff. ¶ 1. These two versions of the history of the occupancy of the house cast into significant

doubt whether the house was occupied for the 60 days prior to the fire. See id. There is also evidence that the Subject Premises lacked furniture, suggesting that it was vacated. Simmons Aff. ¶ 1; Coady Aff. ¶ 1. There is also evidence that there was no food stocked in the house, again, suggesting the Subject Premises were vacated. Eisenberg Aff. ¶ 3, EUO, p. 91, Exh. 9 (pictures of empty freezer and cupboard). Furthermore, Ms. Romano states during her examination under oath that she and her sister spent about forty percent of their time living at one of their New Hampshire properties. Eisenberg Aff. ¶ 3, EUO, p. 35-36. Forty percent of a year is nearly 150 days. It is entirely possible that they were living in New Hampshire for more than 60 days prior to the fire.

Other evidence that suggest the house was unoccupied for a long period of time is Ms. Romano's testimony that all calls to the Subject Premises were forwarded to the New Hampshire home. Eisenberg Aff. ¶ 3, EUO, p. 80-81. All of this evidence, especially when taken together, demonstrates that the Plaintiffs have concealed information as to the history of the occupancy of the Subject Premises. These concealments breach and thus void the policy. See Baker, 416 N.E.2d at 189-90; Williams, 115 N.E.2d at 379-81; Ashline, 638 N.Y.S.2d at 218-19.

Furthermore, these inconsistencies and contradictions, even if they prove to be explainable outright misrepresentations, still add credence to Arbella's argument that the financial records and utility bills are all the more necessary to dispel justified suspicions. See Rymsha, 746 N.E.2d at 562-65 (court upheld the trial court's grant of summary judgment for the insurer, in part, because the suspicious circumstances of the loss led to the conclusion that the requested documents were pertinent to the claim).

## CONCLUSION

For the above stated reasons, Arbella requests the Court to grant its motion for

summary judgment on all counts.

### REQUEST FOR ORAL ARGUMENT

Arbella hereby requests that the Court grant oral argument on this motion.

Respectfully submitted,
ARBELLA MUTUAL INSURANCE COMPANY,
By its attorneys,

CERTIFICATE OF SERVICE
I hereby certify that on this date a true copy of the
above document was served upon the attorney of
record for each party by First-Class Mail. Hana
Date: _____
NICHOLAS A. KENNEY

Lewis C. Eisenberg (BBO# 152140)
Nicholas A. Kenney (BBO# 650784)
COSGROVE, EISENBERG & KILEY, P.C.
803 Hancock Street --- P.O. Box 189
Quincy, MA 02170
tel: 617.479.7770

Dated: August 4, 2004