UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

| | |
|---|---|
| THERESA ROMANO, L.R. BLAKE TRUST, and CONCETTA ROMANO, | ) ) ) |
| Plaintiffs | ) ) |
| v. | ) ) |
| ARBELLA MUTUAL INSURANCE CO., | ) ) |
| Defendant | ) ) ) |

2005 JAN 19 P ː 46

U.S. DISTRICT COURT
DISTRICT OF MASS.

Civil Action No.
03-12626MLW

## AFFIDAVIT OF NICHOLAS A. KENNEY

I, Nicholas A. Kenney, hereby depose and state as follows:

1.  I am co-counsel for the Defendant Arbella Mutual Insurance Co. ("Arbella") in the above-captioned action.

2.  On information and belief, attached as Exhibit A to this affidavit is a true and accurate copy of the 93A demand letter from Plaintiffs' counsel, dated October 17, 2003.

3.  On information and belief, attached as Exhibit B to this affidavit is a true and accurate copy of the letter from Arbella's counsel, Lewis Eisenberg in response to the 93A demand letter, dated November 13, 2003.

4.  On information and belief, attached as Exhibit C to this affidavit is a true and accurate copy of the first several pages of the transcript of the April 2, 2002 interview of Theresa Romano by Paul Mahoney.

Signed under the pains and penalties of perjury this ___19___ day of January, 2005.

Nicholas A. Kenney

**CERTIFICATE OF SERVICE**
I hereby certify that on this date a true copy of the above document was served upon the attorney of record for each party by First Class Mail.
Date: 1/17/05

NICHOLAS A. KENNEY

1

LAW OFFICES
# HRONES AND GARRITY
LEWIS WHARF - BAY 232
BOSTON, MASSACHUSETTS 02110-3927

STEPHEN HRONES
JESSICA D. HEDGES

OF COUNSEL
DONALD HARWOOD
(ALSO MEMBER OF NEW YORK BAR)
JOSÉ LUIS SERPA

LIONEL PORTER
PARALEGAL

TELEPHONE (617) 227-4019
FACSIMILE (617) 227-3908
E-MAIL hrones@masscriminallawyer.com
WEBSITE www.masscriminallawyer.com

PAUL J. GARRITY
(ALSO MEMBER OF NEW HAMPSHIRE BAR)

NEW HAMPSHIRE OFFICE:

14 LONDONDERRY ROAD
LONDONDERRY, NEW HAMPSHIRE 03053
TELEPHONE (603) 434-4106
FACSIMILE (603) 437-6714

CERTIFIED MAIL

October 17, 2003

Arbella Mutual Insurance Company
Claims Department
11 Riverside Drive
Lakeville, Massachusetts 02347

RE:  **Our Clients:**   **Theresa Romano, L.R. Blake Trust, and Concetta Romano**

**Your Insured:**   **L.R. Blake Trust c/o Theresa Romano and Concetta Romano**

**Date of Loss:**   **January 1, 2002**

**Your File No.:**   **000212762 and 000213645**

Dear Sir or Madam:

Please be advised that we have been retained by the above named clients, Theresa Romano, L.R. Blake Trust, and Concetta Romano in connection with any and all claims made against Arbella Mutual Insurance Company ("Arbella"). As you know, our clients had policies of insurance pertaining to their residence and personal property at 49 Bowdoin Avenue, Dorchester, Massachusetts. (Policy Nos. 83217400000 and 03234400001). On January 1, 2002, the subject premises was destroyed by fire. To date, Arbella has disclaimed coverage for this loss. Please accept this letter as a formal request to make a reasonable offer of settlement pursuant to G.L. c.93A and 176D.

I.    <u>BACKGROUND</u>

Theresa Romano and her sister, Concetta, are 71 and 69 years old, respectively. The Romanos are unmarried and do not have any children. They had lived at the subject premises for their entire lives. At the time of the loss, the Romanos were well off financially. They inherited the house from their parents and owe no mortgage on the property. At that time, Theresa Romano also owned two homes – paid for in cash – in Nashua, New Hampshire. In addition, Theresa receives approximately $42,000.00 annually in disability income. Theresa has power of attorney on behalf of her sister, Concetta, who is physically handicapped.

Theresa has a number of physical ailments as well. She has suffered from chronic sciatica for the past 22 years. She also has neuritis in her feet. In 1985 she lost her right breast and all of her lymph nodes to cancer. In 1993, she lost her left breast to cancer. In 1998 she underwent surgery to remove cancer from beneath her left armpit. She suffers from an

uncontrollable blood pressure and frequently experiences heart palpitations resulting in regurgitation, high blood pressure, and an abnormal "double pulse" in her neck.

In addition, as a result of Arbella's unfair investigation of her claim, Ms. Theresa Romano has experienced severe anxiety, depression, and many sleepless nights. Her doctor has diagnosed her condition as post-traumatic stress for which she has proscribed Zoloft and Serac for the attendant depression and anxiety. She reluctantly takes this prescribed medication, due to concerns of stimulating any new cancer cells.

The burden of proof is on Arbella to demonstrate, as an affirmative defense, that the insured was responsible for causing the fire. Mass.Jur.Insurance, §16:16. Arbella, through its counsel, terms this fire "suspicious," stating there are "too many vague and unanswered questions" surrounding this loss. (p. 9 of March 7, 2003 letter). Arbella cannot meet its burden of proof.

Lacking any factual support for its suspicions, Arbella cites "lack of cooperation" and "material misrepresentation" as the legal justifications for its disclaimer of coverage. Arbella's handling of the Romanos' claim has been made in bad faith, in violation of G.L. c.93A and c.176D.

II.    <u>G.L. c.93A and c.176D</u>:

Chapter 176D of the Massachusetts General Laws prohibits "[u]nfair claim settlement practices," including the following:

(1)    Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies. G.L. c. 176D, § 3(9) (c).

(2)    Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed. G.L. c. 176D, § 3(9) (e).

(3)    Failing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear. G.L. c. 176D, § 3(9) (f).

(4)    Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds. G.L. c. 176D, § 3(9) (g).

(5)    Delaying the investigation or payment of claims by requiring that an insured or claimant, or the physician of either, submit a preliminary claim report and

2

then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information. G.L. c. 176D, § 3(9) (l).

(6)    Failing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement. G.L. c. 176D, § 3(9) (n).

Unfair insurance practices constitute a violation of G.L. c. 93A, § 2. See *Van Dyke v. Saint Paul Fire and Marine Insurance Co.*, 388 Mass. 671, 675 (1983); *Dodd v. Commercial Union Ins. Co.*, 373 Mass. 72, 78 (1977).

III.    "LACK OF COOPERATION"

Arbella cannot credibly maintain that the Romanos have failed to cooperate with Arbella in its investigation of this claim. Consistent with their obligations under both the policy and G.L. c.175, §99, the Romanos have complied with all requests to produce material evidence in support of this loss. Upon discovering of the loss the following day, Ms. Theresa Romano promptly notified Arbella of this claim. On January 4, 2002, she met with fire officials who were investigating the cause and origin of the fire. She signed a fire scene examination consent form, permitting Boston Fire Department officials and Arbella to thoroughly examine the scene.[1] The subject premises have been available to Arbella for inspection, as required under G.L. c.175, §99.

Ms. Theresa Romano submitted to a sworn recorded statement on April 2, 2002, followed by an Examination Under Oath ("EUO") on July 24, 2002. Through these examinations, she provided Arbella with information regarding their personal and financial background, including a detailed account of their activities during the hours immediately preceding and following the fire.

The Romanos also provided documentary evidence in support of their claim. On May 30, 2002, the Romanos produced sworn statements in proof of loss submitted by Seltser & Seltser, Public Adjusters, Inc. The sworn statements set forth in detail the items of personal and real property damaged in the subject fire, their replacement value, and their actual cash value at the time of the loss, including depreciation.

Ms. Theresa Romano voluntary provided legal documents evidencing the existence of the L.R. Blake Realty Trust, its purpose, and schedule of beneficiaries. She has also provided

---

[1] On January 10, 2002, two Boston Fire Department investigators, acting at the behest of Arbella, knocked on the Romanos door in Nashua, *New Hampshire* at *9:30 P.M.* to reexamine them about their knowledge of the fire. Not knowing the strange men knocking on her door, she called the Nashua police to respond to what she believed was a breaking and entering in progress.

3

medical authorizations permitting the release of relevant medical records from the Carney Hospital. The Romanos have also agreed to provide any electrical and/or utility bills evidencing their occupancy of the subject premises. The Romanos have fully and completely cooperated with Arbella in its investigation of this loss.

Notwithstanding the production of such evidence, Arbella maintains that the Romanos' failure to produce *utility bills* and *bank account records* voids its obligations under the policies. First of all, as Arbella is well aware, these records were destroyed in the fire. To suggest that the failure to produce destroyed items voids the policy is unfair, unreasonable and oppressive. Theresa Romano has *repeatedly* explained that she is more than willing to produce the requested utility bills. In fact, Arbella could have easily obtained an authorization signed by Ms. Romano to obtain these bills and records in the fourteen (14) months from the date of loss to the denial of coverage. Instead, Arbella has chosen to void the policy for the insured's failure to obtain that which Arbella could have obtained for itself. Arbella has failed to effectuate a prompt, fair and equitable settlement of this claims in which liability has become reasonably clear in violation of G.L. c. 176D, § 3(9) (f).

Arbella has also failed to provide a prompt, *reasonable* explanation of the basis for its denial of this claim in violation of G.L.c. 176D, § 3(9)(n). Noting that the policy can be voided if the premises are "vacant or unoccupied" for a period of 60 consecutive days, Arbella claims these records are relevant to the issue of occupancy. However, Arbella also suggests in its denial letter of March 7, 2003, that a caretaker – and a bicycle –occupied the subject premises at the time of the loss. It is not only disingenuous, but another example of Arbella's bad faith handling of this claim, to argue that the subject premises was both occupied, and unoccupied, at the time of the loss. Arbella speaks out of both sides of its mouth in denying this claim. (Arbella does not explain how bank accounts are relevant to the issue of occupancy at the subject premises.) Arbella cannot adopt *contradictory* arguments for denying coverage just because it happens to suit its purpose. Such tactics amount to wilful misconduct.

Arbella's arguments regarding the production of *financial records* and a *medical authorization* are without merit. Arbella argues that they need financial records to uncover a possible motive for this loss. However, the Romanos are financially well off. As discussed, they own several properties and have independent sources of income. Certainly, the Romanos' financial status has been corroborated by Arbella in its investigation of this claim. Arbella cannot legitimately maintain that there is a financial motive for this loss. The production of bank records is not necessary to Arbella's investigation of this claim.

As for the medical information, Arbella completely ignores the fact that a medical authorization *was provided* and that Arbella has obtained the requested medical information regarding Ms. Romano's Emergency Room treatment at the Carney hospital. Arbella's

4

insistence on obtaining records that it already has is another example of its bad faith in the handling of this claim.

## IV.    "MISREPRESENTATION"

Arbella also has no legitimate basis for asserting the affirmative defense of material misrepresentation in this case. Ms. Theresa Romano has been cooperative and forthright with Arbella in its investigation of this loss. That some of the Romanos' actions on New Year's Day may appear eccentric to some should not affect the veracity of their claim. Any perceived individual idiosyncrasies regarding the Romano sisters should only serve to explain the unusual events occurring around the time of the loss.

As you know, Ms. Theresa Romano is an elderly woman who, in addition to having multiple physical disabilities herself, must tend to the needs of her disabled sister, Concetta. On that particular evening, Concetta was in a highly agitated state and Theresa sought to take her out to hopefully cheer her up. Theresa recalls that it was a very hectic process to assist her sister out of the house so that they could see the events of First Night in Boston.[2] In any event, her inability to recall whether she locked the door is hardly evidence of misrepresentation. Arbella should not impute a bad motive to an entirely innocent oversight of detail.

Significantly, each portion of Ms. Romano's testimony regarding her whereabouts during the time of the fire has been corroborated by Arbella in its investigation of this loss. Ms. Romano indicated that she checked into the Emergency Room at the Carney Hospital for heart palpitations and headaches, and hospital records obtained by Arbella confirm that very fact. The records also confirm that the hospital insisted that she be admitted overnight, but that she refused due to concerns over her sister who was sitting in the car with urine soaked blankets. Ms. Romano testified that she called a taxi cab because her brakes were poor, and Arbella has confirmed with the taxi driver that she did call him and indicated that her brakes were poor. Arbella's contention that the cab driver stated the brakes were fine is immaterial; she was afraid to drive the car to New Hampshire so she asked the cab driver to drive for her. Arbella has confirmed that the cab driver drove her to her house in Nashua, New Hampshire. Arbella's investigation has apparently confirmed that she does in fact own a home in Nashua. Thus, while Arbella may comment that the Romanos' behavior on New Year's Day was unusual, it cannot legitimately dispute Ms. Romano's truthfulness regarding her actions that day.

Arbella's reliance on G.L. c.175, § 186 is wholly misplaced. Section 186 proscribes "oral or written misrepresentation or warranty made in the *negotiation of a policy of insurance* by the insured or in his behalf . . .[that] increase[s] the risk of loss." It is unfair and deceptive for

---

[2] In light of the effort involved in getting Concetta from the house into the back seat of the car and providing her with enough blankets to keep warm, Theresa was unwilling to go back to the house that same evening. This explains why she opted to travel straight from the hospital to Nashua.

Arbella to cite inapplicable law in its denial of coverage. G.L. c. 176D, § 3(9) (n)(emphasis added).

V.    CONCLUSION

Arbella is under a duty to "pay any claim promptly, and if it is later found to have acted inappropriately delayed or withheld payment, it may significantly increase its own liability." *Mello v. Hingham Mutual Fire Insurance Company*, 421 Mass. 333, 341-342 (1995). Arbella has clearly breached its duty to pay this claim promptly.

Arbella has had more than sufficient time to investigate this loss. Arbella's letter of March 7, 2003, occurred over ten (10) months after proof of loss statements have been completed by the Romanos. During that time frame, it has conducted two separate examinations of Ms. Theresa Romano, covering identical lines of questioning, which constitutes an unreasonable burden on an insured in violation of c.176D(3)(9). Arbella has had three months to review the EUO and six months to review the recorded statement before reaching a conclusion as to coverage. Arbella's failure to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed constitutes a violation of G.L. c. 176D, § 3(9)(e).

As a result of the unfair and deceptive acts and practices of Arbella, the Romanos have had to hire attorneys to assist them in the recovery of the instant matter.

Moreover, Arbella has also caused the Romanos great mental distress by their failure to handle this matter in a professional manner. Through its investigation, Arbella has ignored the factual evidence obtained, and chosen to cast aspersions on Ms. Theresa Romano's good name. The totality of these allegations has caused the Romanos great mental anguish. The Romanos are unable to function normally due to the stress imposed upon them by Arbella.

Pursuant to c.93A, Arbella has thirty (30) days from your receipt of this letter to respond with a reasonable offer of settlement. If you fail to do so, that statute provides that you will be subject to the full force of the law, including multiple damages, attorney's fees and costs.

Thank you for your attention to this matter.

Very truly yours,

Stephen Hrones

6



# COSGROVE, EISENBERG AND KILEY, P.C.
### COUNSELORS AT LAW

MARTIN S. COSGROVE
LEWIS C. EISENBERG
THOMAS R. KILEY
PETER M. McELROY
CARL VALVO

WILLIAM J. CINTOLO
PAUL R. MATTHEWS
THOMAS B. DROHAN
KENNETH W. TERRELL

November 13, 2003

**CERTIFIED MAIL / R.R.R.**
**& U.S. MAIL**

Stephen Hrones, Esq.
Law Offices of Hrones & Garrity
Lewis Wharf – Bay 232
Boston, MA  02110-3927

| | | |
|---|---|---|
| **RE:** | **Your Clients:** | **Theresa Romano, LR Blake Trust, and Concetta Romano, Trustee** |
| | **Loss Location:** | **49 Bowdoin Avenue, Dorchester, MA** |
| | **Date of Loss:** | **January 1, 2002** |
| | **Our File No.:** | **arb210772** |

Dear Attorney Hrones:

This office has been retained by Arbella Mutual Insurance Co. to respond to your demand for relief pursuant to General Laws Chapter 93A, Section 9 and General Laws Chapter 176D dated October 17, 2003.

As you are well aware, Arbella Mutual Insurance Co. disclaimed coverage to your clients by its letter of March 7, 2003. Another copy of that letter is attached hereto and is specifically incorporated by reference herein. Arbella denies that it engaged in any unfair and deceptive trade practices as codified by General Laws Chapter 93A, Section 9 and pursuant to General Laws Chapter 176D.

The factual background of this loss has been developed by Arbella through its investigation, the statement taken of Theresa Romano of April 2, 2002, and the examination under oath of Theresa Romano of July 24, 2002. From all the factual information developed, Arbella formulated its position and set it forth in the letter of disclaimer of March 7, 2003. I do not believe that it is necessary to repeat all of the relevant information herein. Suffice it to say, an active investigation undertaken by Arbella raised many questions regarding your clients' conduct and nothing contained in your letter changes that assessment.

Stephen Hrones, Esq.
Law Offices of Hrones & Garrity
November 13, 2003
Page 2

With regard to issues of cooperation, I have already addressed those points in the disclaimer letter. To the extent that you suggest that your client was willing to produce additional information sought by Arbella, the record is quite clear that they, and their prior counsel, did not do so. During the examination under oath, an objection was taken by former counsel for your clients indicating that his client would not answer certain questions. He instructed her not to answer questions that are relevant and material to the insurer's investigation. After the examination under oath, two letters were written to your clients through counsel of September 9, 2002 and October 1, 2002 again requesting that additional information be provided (both attached herein to disclaimer letter). This information was never provided.

I appreciate your comment that your clients have financial means and therefore would have no motive to cause the fire. I do not read any of the case law that suggests that people of financial means, by definition, would not have any motive to start a fire. The most recent decision by our court Rymsha v. Trust Ins. 51 Mass. App. Ct. 414 (2001) makes it clear that cooperation is required and relevant financial records, once requested, need to be produced. Not only was financial information sought, additional materials were sought regarding the care and upkeep of the home including utility bills. Although your letter indicates some willingness on the part of your clients to cooperate, your clients and their prior counsel had ample opportunity to do so back at the time that the investigation was ongoing. The point is that your clients did not cooperate and they have voided the policy under decided case law. Specifically, your letter at page 3 suggesting ". . . the Romanos have complied with all requests to produce material evidence in support of this loss" is factually inaccurate.

Your suggestion that Arbella cannot "legitimately maintain that there is a financial motive for this loss" misses the point. Arbella is entitled to financial information from its insured to satisfy itself. Your clients failed to produce that information and that is one of the bases for the lack of cooperation.

Regardless of whether some materials sought may have been destroyed in a fire, utility bills and bank account records are materials that your clients had an obligation (and an opportunity) to secure. Certainly, bank records are available to her regardless of whether she lost her account information or lost it in the fire. In fact, your client specifically indicated in the examination under oath that she would be happy to do so. "I can happily get them from the companies . . ." (p. 57). Your suggestion that your client has "repeatedly explained that she is more than willing to produce the requested utility bills" is not met with the history of what has occurred in this case.

Stephen Hrones, Esq.
Law Offices of Hrones & Garrity
November 13, 2003
Page 3


With regard to your suggestion that the letter of disclaimer improperly suggests that the property was both occupied and unoccupied at the same time, a fair reading of the letter of disclaimer does not so state. In fact, my letter suggests that at the time that your clients listed the property for sale in year 2000, they indicated to the real estate broker that a male was occupying the house or at least staying in the lower level of the house (identified as Boudre). You are correct in stating that Arbella sought information concerning the occupancy issue of the house but at no time has Arbella suggested that as of the time of the loss on January 1, 2002 that it had any information that Boudre was occupying the house at that time.

For all the above reasons, Arbella stands on its disclaimer and in response to your demand for relief makes no offer to your client on either policy of insurance (LR Blake Realty Trust, Policy No. 83217400000; tenant Theresa Romano, Policy No. 03234400001). Arbella reserves its right to disclaim coverage for any additional reasons that may be developed in this matter.

Very truly yours,

Lewis C. Eisenberg

LCE/sas
Enclosure
cc:    Arbella Mutual Insurance Co.

# COSGROVE, EISENBERG AND KILEY, P.C.
### COUNSELORS AT LAW

MARTIN S. COSGROVE
LEWIS C. EISENBERG
THOMAS R. KILEY
PETER M. McELROY
CARL VALVO

WILLIAM J. CINTOLO
PAUL R. MATTHEWS
THOMAS B. DROHAN
KENNETH W. TERRELL

March 7, 2003

**CERTIFIED MAIL / R.R.R.**

Dane M. Shulman, Esq.
Law Office of Dane M. Shulman
25 Newport Avenue Extension
North Quincy, MA  02171

|        |                    |                                       |
|--------|--------------------|---------------------------------------|
| RE:    | Your Client:       | **LR Blake Trust, Concetta Romano, Trustee** |
|        | Your Client:       | **Theresa Romano**                    |
|        | Loss Location:     | **49 Bowdoin Avenue, Dorchester, MA** |
|        | Date of Loss:      | **January 1, 2002**                   |
|        | Our File No.:      | **arb210772**                         |

### NOTICE OF DISCLAIMER

Dear Attorney Shulman:

Please consider this letter as a notice of disclaimer of Arbella Mutual Insurance Company for all claims of the LR Blake Realty Trust, Concetta Romano, Trustee, and for Theresa Romano as a result of a fire on January 1, 2002.  Specifically, the Arbella claims are:

1.  Insured, LR Blake Realty Trust, Concetta Romano, Trustee, under Policy No. 83217400000 for personal property loss and dwelling loss.

2.  Insured, Theresa Romano, under Policy No. 03234400001 for personal property loss.

### Factual Information

As you know, a fire occurred on January 1, 2002 at the property located at 49 Bowdoin Avenue, City of Boston.  That property is owned by Concetta Romano as she is a trustee of the LR Blake Realty Trust (hereinafter Blake).  Concetta Romano, on behalf of the trust, had a homeowner's policy of insurance, which contained, *inter alia*, dwelling coverage and personal property coverage.  Her sister, Theresa Romano, who resided in the house, had a tenant's policy of insurance with, *inter alia*, personal property coverage.

Dane M. Shulman, Esq.
Law Office of Dane M. Shulman
March 7, 2003
Page 2

Arbella has conducted a thorough investigation of this fire. A review of the nature of this fire lends itself to the need for such an investigation. It is for this reason that requests have been made of your clients for interviews, examinations under oath, production of documents and related items. It appears undisputed that this fire was intentionally set by someone. The front door was barricaded from the inside and several gas cans were found inside the home. There were no signs of forced entry and the side door (to the rear) was partially open when a police officer first saw the fire and reported it to the Boston Fire Department. Clearly, this fire was not an act of vandalism. To date, law enforcement has not indicated that any arrests or prosecutions have been commenced.

Factual information has been provided by your clients that has not clarified many of the questions that Arbella has about this fire. Theresa Romano has indicated that she along with her sister Concetta Romano (who is disabled) reside in this house for part of the year and also reside in a home in Nashua, New Hampshire. She asserts that the two women had been in the Boston home on New Year 's Eve on December 31, 2001 until approximately 11:30 p.m. and then went to see the sites of the New Year 's Eve celebration. At 1:30 a.m., she claims that she and her sister went in search of a meal at a local restaurant, which was closed.

She then sought medical treatment at Carney Hospital, as she was not feeling well. She claims to have been at Carney Hospital on January 1, 2002 from 1:30 a.m. to 6:00 a.m. getting treatment. Her sister, Concetta Romano, stayed in the car at the Carney Hospital parking lot with the engine off for this entire time. It was during this timeframe that the fire occurred. The first call for the fire was at 6:49 a.m. from Captain Dunford of the Boston Police Department. Once her treatment was done, Theresa Romano claims that she and her sister sat in their car in the parking lot at Carney Hospital until 6:00 pm on January 1, 2002. Eventually, they called a taxi from Marina Bay Taxi since Theresa Romano did not want to drive her car to New Hampshire (where they had intended to go) due to poor brakes. The taxi driver who responded to the call (Aziz Talal) found that there was nothing wrong with the brakes. He eventually drove the two women to New Hampshire in the Romano vehicle that evening. Your client had raised a concern that she did not want to drive in the evening hours. The taxi driver has indicated that there were several bags of clothing on the back seat of the car. Arbella has interviewed the driver.

When your clients arrived in New Hampshire, they asserted that they did not have a key to the house and proceeded to the local fire department to gain entry. Theresa Romano had a real estate tax bill in the car to prove ownership of the home and was allowed entry with the help of the fire department to enter 9 Amherst Street in Nashua.

Theresa Romano indicated in the examination conducted on July 24, 2002 that she had no reason to barricade the front door and had not done so. She also indicated at the time of the recorded statement with Paul Mahoney (hereinafter statement) that she had locked the side door to the house. Accordingly, someone had access to the inside of the house, as there was no forced entry. At the examination, your client indicated that she

Dane M. Shulman, Esq.
Law Office of Dane M. Shulman
March 7, 2003
Page 3

was no longer sure whether she had locked the side door when she left the house with her sister on New Year's Eve.

With regard to the visit to the Carney Hospital and the ten or twelve hours spent in the parking lot of the hospital, there was no offer of explanation as to why they did not return to their home which was no more than a few miles from the hospital. Theresa Romano claims that she did not learn of the fire until the evening hours of January 1, 2002. Her property was no more than a few miles away from the hospital (at best) and, purportedly, she had no reason to know of the fire. The fact that Miss Romano claims that she could not find a restaurant that was open at 1:30 a.m. on New Year's Day seems implausible. Furthermore, once they learned from the taxi driver that the brakes were fine, they could have gone to their Dorchester home for the evening and traveled to New Hampshire the next morning. They did not do so, yet at that time, Miss Romano did not know of the fire. If she did know of the fire, it would (I am sure you agree) easily explain their unusual behavior on New Year's Day. The presence of the tax bill in the car also seems odd where she had the bill but not the key to the house.

With regard to the home and the desire by your clients to sell the home, there has also been an investigation undertaken by Arbella. The house was listed with Jack Conway Realtors in 2000. Your client listed the property for sale with Lee Coady of Jack Conway Realtors at 1810 Dorchester Avenue in Dorchester between February 7 and May 2, 2000 for $189,900.00. Offers were made in the range of $150,000.00 which was not suitable to your client and she pulled the property off the market. She once again contacted Jack Conway through Julie Simmons in May of 2001 to make inquiry regarding the possible relisting of the property. She inquired whether the real estate market had increased. She was told it had not and was given listing papers to fill out which she did not do. The property was never relisted for sale. It appears that your client was unable to sell the home at a price that she found attractive. Arbella has interviewed both realtors.

Theresa Romano indicated to both brokers that the property was vacant and that there was a caretaker who they could contact to show the property. In 2000, he was staying in the lower level of the house and Mr. Coady identifies him as Boudre. Boudre was asked to leave the property if it was going to be shown.

It is noteworthy that the agreed upon damages between the public adjuster and Arbella for this loss for the actual cash value (ACV) for the dwelling is $210,890.00, a sum greater than the price that the home was listed for and substantially greater than the offers presented to the Romano sisters by the realtor. The fire was within six months of the last inquiry by the Romanos to the broker.

As stated, your client indicated to realtors, Lee Coady and Julie Simmons both in 2000 and in 2001 that the house was vacant. At the time of the examination, she denied the same. Your client indicated at the time of her examination that Levon Boudre was someone she knew but he never lived in the home.

Dane M. Shulman, Esq.
Law Office of Dane M. Shulman
March 7, 2003
Page 4

Your client's friendship and acquaintance with Levon Boudre is also the subject matter of investigation by Arbella. At the time of the statement, Theresa Romano indicated that she did not know if she knew him and then indicated that she did. She indicated that Sonny is a different person then Levon Boudre. She identified Sonny as a handyman who did work around her home. At the time of the examination, she indicated that Sonny Lee and Levon Boudre were the same person and that she did know him. It appears that your client has made an effort to distance herself from her acquaintance with Mr. Boudre. However, neighbors in Nashua, New Hampshire (who have been interviewed by Arbella) have indicated that they have seen Levon Boudre at the property many times, that he has driven Theresa Romano's car, and has been seen working at the home on numerous occasions.

A motor vehicle accident that occurred in September of 2000 resulted in some investigation by the Nashua Police Department. On the Traffic Accident Information form, Mr. Boudre identified himself as the driver of Theresa Romano's car and gave an address of 7 Amherst Street in Nashua. Your client acknowledged the accident (or at least damage to a door of the car in the Home Depot parking lot) but denied that Mr. Boudre ever lived at her properties in New Hampshire. The intake information provided by Theresa Romano to Arbella at the time of this prior incident revealed that she, and not Mr. Boudre, was the driver of the auto.

Access to the home is another important issue for Arbella. Miss Romano indicated at the time of the examination that there were only two keys to the home, one of which she had, and her sister Concetta Romano had the other. It appears that Mr. Boudre (at least in 2000) had access to the home and a key to the home.

The Carney Hospital records were received by our office on or about January 25, 2003 and were sent to you by letter of January 27, 2003. The only complaints noted from your client, Theresa Romano were for palpitations over the last week and that she felt her heart rate felt fast and was skipping beats. There is no reference in the records to headaches, being sick, or palpitations for one month, which are conditions she identified at the time of her examination under oath. There was no acute illness or condition noted. Miss Romano left the hospital against medical advice and refused admission at about 5:15 a.m. that morning.

Arbella has reason to be suspicious regarding the subject claim. The factual information that Arbella has sought is important in developing the facts as to occupancy of the building, your clients' whereabouts in the early morning hours of January 1, 2002, access to the home, the Romanos' relationship to Levon Boudre, and production of documents and information including financial information.

Based upon the facts and circumstances of the factual information developed and the responses by your office and those of your clients on this matter, Arbella Mutual Insurance Company hereby disclaims coverage on both policies. To the extent that a

Dane M. Shulman, Esq.
Law Office of Dane M. Shulman
March 7, 2003
Page 5

durable power of attorney is in place for Concetta Romano by her sister Theresa Romano. Arbella has treated the actions of Theresa Romano as speaking for herself and also for her sister Concetta Romano. The durable power was signed on August 28, 1984 purportedly pursuant to Chapter 201B "Uniform Durable Power of Attorney Act".

The basis of the disclaimer is for the following reasons:

I    **Lack of Cooperation**

At the time of the examination, Arbella requested of both Theresa Romano and Concetta Romano that certain documents be produced. Specifically, the following documents were sought from both insureds:

1.    Electric and gas utility bills for the last three years for the subject property at 49 Bowdoin Avenue.

2.    Documents evidencing any bank accounts in New Hampshire as of January of 2002.

3.    Documents evidencing any bank accounts in Massachusetts as of January 2002.

4.    Documents evidencing any bank account in the name of LR Blake Trust in existence in January of 2002.

I followed the examination with additional requests for information and documents from your clients. None have been produced.

1.    Utility bills. At page 57 of the examination inquiry was made regarding gas and electric bills regarding the property. Theresa Romano indicated that she did not have the bills as they were lost in the fire but stated: "I can happily get them from the companies . . ." This was followed by my letter of September 9, 2002. At that time a request was made for the production of gas, water, telephone and electric bills for the three years leading up to the date of the fire. (See letter of September 9, 2002 at page 2, Exhibit A). To date, none of these documents have been produced. The letter was addressed to you as counsel for both Theresa Romano and to Blake Realty Trust.

The production of these documents is material and relevant to the inquiry by Arbella. Specifically, General Laws Chapter 175, Section 99 states, in part, that the insurer is not liable for a loss while the described premises, whether intended for occupancy by owner or tenant are vacant or unoccupied beyond a period of 60 consecutive days for residential purposes . . ." This language is included in both of the insurance policies written by Arbella for your clients under the "Special Provisions - Massachusetts". Arbella has reason to believe that the house was unoccupied on the date

Dane M. Shulman, Esq.
Law Office of Dane M. Shulman
March 7, 2003
Page 6

of the fire. Apart from the information that was provided to the real estate agents (that the house was vacant), an examination of the fire scene by Arbella revealed that the refrigerator was empty of any food and the house was sparsely furnished. Occupancy means a place of habitation and use as a dwelling. Corrigan v. Connecticut Fire Insurance, 122 Mass. 298 (1877). In Langell v. Vermont Mutual Ins. Co., 268 Fed. 3rd 46, 49 (1st Cir. 2001) (applying Mass. law) the court found that what is required is sustained presence of a resident.

Your client's failure to produce utility bills, notwithstanding her agreement to produce them, is a violation of her duty to cooperate with her insurer. These records are material to the policy provisions.

2.    Financial Records. During the examination of Theresa Romano, financial records were sought. Specifically, at pages 58 through 60, documentation was sought regarding bank accounts in New Hampshire and Massachusetts for both Theresa Romano and Concetta Romano. Your response to my inquiry was that your client did not want to answer any questions regarding bank accounts. You indicated that she would state that she has bank accounts but would not provide any further information. At pages 62 and 63, inquiry was made as to whether the responses of Theresa Romano would be applicable, as well, to Concetta Romano and she indicated that the answers would be the same.

I followed this inquiry with my letter of September 9, 2002 (Exhibit A) wherein I requested financial information. Specifically, I addressed the document listing sought at the time of the examination (par. 7 and 8 addressed to both). Demand was made for cooperation by your clients and for the production of financial information. The information that was sought was in conformity with paragraphs 7 and 8 of the schedules and also personal tax returns for both women for calendar years 1999, 2000 and 2001. In my letter of October 1 (Exhibit B), I once again reiterated that request. None have been produced.

The failure of your clients to produce the financial information that has been demanded is in breach of the cooperation provisions of the insurance policy.

3.    Medical Authorization. In April of 2002, Paul Mahoney on behalf of Gallagher & Mahoney, the independent investigator working for Arbella, demanded medical authorizations for the securing of records of Theresa Romano of January 1, 2002. The issue of a medical authorization came up at the time of the statement that Mr. Mahoney took. A medical authorization was signed on April 2, 2002 by Theresa Romano for release of her medical records. All efforts by Paul Mahoney to obtain those records from the Carney Hospital were unsuccessful. It was unclear to me what role, if any, your client played in notifying the Carney Hospital not to release the records (even though she had executed a medical authorization).

Dane M. Shulman, Esq.
Law Office of Dane M. Shulman
March 7, 2003
Page 7

I followed that request with a letter of September 9, 2002 after the examination wherein I requested a medical authorization for the records only for January 1, 2002. That was followed by my letter of October 1, where again I reiterated that I was seeking that medical authorization. By letter of October 3, 2002, a medical authorization was provided to me for the release of records of the Carney Hospital of January 1, 2002 for patient Theresa Romano. I promptly sent that request to the Carney Hospital by letter of October 8, 2002 (your office was copied on that letter). I was notified on November 20, 2002 by the Carney Hospital that they were "awaiting to hear from Miss Romano for permission to release her records."

Your client indicated at the time of her examination that she was having terrible headaches which she had for one week, she felt very sick, the back of her head hurt, she had shortness of breath, and had palpitations for about one month. (Pages 74, 75). The securing of these records is important to these issues. It took nine months to receive these records.

It goes without saying that an insured has a duty to cooperate regarding a claim pursuant to General Laws Chapter 175, Section 99 on an insurance policy. See, Mello v. Hingham Mutual Fire Insurance Co., 421 Mass. 333, 336 (1995). In Rymsha v. Trust Insurance Co., 51 Mass. App. Ct. 4014, 4017 (2001), our court held that the reasoning of the Mello case is equally applicable whether the issue is an examination under oath or the production of reasonably requested documents. There, the insurer had a right to assure itself of the validity of the claim and the requested documents were relevant to the questions and inquiry that the insurer had. Accordingly, the production of relevant documents is important to the carrier in order to make an informed decision as to the merits of a claim.

The conditions for both of the policies in issue require that the insurer "may reasonably require you to: . . . (2) provide us with records and documents pertinent to the loss and permit us to make copies and (3) submit to an examination under oath, while not in the presence of any other insured and sign the same." General Laws Chapter 175, Section 99 states in part that " . . . as often as may be reasonably required, shall produce for examination all books of account, bills, invoices and other vouchers, or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by this company or its representative, and shall permit extracts and copies thereof to be made." Additional conditions that are relevant to both Sections 1 and 2 of the policy under "concealment or fraud" indicate that there is no coverage for a loss where the insured has "intentionally concealed or misrepresented any material fact or circumstance."

Hence, the inquires that have been made by Arbella for the categories of documents identified above are all relevant and material. The financial records are important to determine whether there is any motivation for the client in causing the fire. The Rymsha decision specifically addressed the furnishing of financial information after

Dane M. Shulman, Esq.
Law Office of Dane M. Shulman
March 7, 2003
Page 8

the loss. There, the insured claimed that she had a theft of personalty (jewelry) from a rented vehicle. The insurer sought personal tax returns and other business records of the insured. Where the insurer had a right to assure itself of the validity of the claim, the request for financial information is relevant. Rymsha at 418. This information was relevant as to whether the insured had a motive to stage the loss. When dealing with the issue of whether the insurer had shown prejudice, as required under Darcy v. Hartford Insurance Co., 408 Mass. 481, 490 (1990), the court had no trouble in finding that the insurer was able to make an affirmative showing that there was prejudice by the insured's failure to provide the requested information. The court held that "we think the prejudice to Trust too obvious to warrant discussion. It is enough to state that Rymsha's blanket refusal to provide the reasonable requested documents even stymied Trust's ability to show actual prejudice."

Your clients have had ample time to provide these records but have not done so. Your office never acknowledged either of these letters (Exhibit A & B) for the information sought other than the medical authorization. This disclaimer is sent almost six months since the sending of Exhibit A.

## II    Misrepresentation

Pursuant to both Section One coverages for both of your clients, there is no coverage for a loss where an insured has "intentionally concealed or misrepresented any material fact or circumstance" and "made false statements". Arbella disclaims on both of these policies for the conduct of Theresa Romano acting for both insureds, both in the examination and in the statement taken.

At the time of the recorded statement, your client was asked who is Levon Boudre and her response was "well, I don't know" (at 54). She then indicated that she knew Levon Boudre and indicated that she did not know where he lived. She was asked whether he ever lived at 49 Bowdoin Avenue and your client indicated "absolutely not" (page 55). She was asked whether or not he ever stayed in the house in New Hampshire and your client indicated that the only person that ever lived at 49 Bowdoin Avenue were her and her family (at 55). When inquiry was made regarding Sonny, your client never indicated in the statement that Sonny (as she had told the realtor that the contact person for the showing of the property was Sonny) and Levon Boudre was the same person (at 55). This information is false and misleading.

As recently as several months ago, Lt. Hickey of the Boston Arson Squad saw Theresa Romano with Levon Boudre locally in Boston coming out of a post office. Yet, when inquiry was made of Miss Romano regarding how to get in touch with Levon Boudre, she stated that she had no way of getting in touch with him and did not know where he lived. Lee Coady, the realtor, confirmed for Arbella that the person he was to contact for the showing of the "unoccupied" residence was Boudre. Mr. Boudre also listed his address after the auto accident in New Hampshire as one of the properties of

Dane M. Shulman, Esq.
Law Office of Dane M. Shulman
March 7, 2003
Page 9

Miss Romano in New Hampshire. In her statement Miss Romano stated that she could not recall if Mr. Boudre had ever been to her home in New Hampshire (at 58).

Miss Romano also indicated at the time of the examination that she was living in the house at 49 Bowdoin Avenue. However, information provided to the realtors both in year 2000 and again in year 2001 was that she was not living in the house, that the house was vacant, and that there was a caretaker who the realtor could get in touch with for access to the house. The lack of food and significant furnishing in the house would also lead to that conclusion.

The access to the house (i.e., keys) is also significant. Your client indicated no one other than she and her sister had keys. Yet, the realtors were told that a caretaker (known as Boudre) was at the house. Miss Romano could not tell me whose bicycle was in the basement yet no one else lived at the house.

The intentional furnishing of false information of a material nature is a breach of the cooperation clause and also a breach of the specific conditions regarding the duties of an insured after a loss. See Employers' Liability Assurance Corp. v. Vella, 366 Mass. 651, 654 (1975). Any material misrepresentation may serve as a basis for avoiding coverage. Deliberate and willful falsification of material facts violates the terms of the policy. The furnishing of such information, known to be false and of a material nature, is a breach of the cooperation clause. Williams v. Travelers Insurance, 330 Mass. 476, 479 (1951). Communications with the insurance company concerning a claim must be truthful and must be made in good faith. Williams, supra at 479. Misrepresentations by the insured that are clearly material may be the basis for a disclaimer especially where the issue raised by the false statements is one of particular importance in the investigation of the claim. See Cassidy v. Liberty Mutual Insurance Co., 338 Mass. 139, 142 (1958).

The issue of prejudice must also be shown by Arbella and Arbella is satisfied that it can make such a showing. In Darcy v. Hartford Insurance Co., 407 Mass. 481, 491 (1990), the court noted that an insurer seeking to disclaim on the grounds of the breach of cooperation provision may only do so upon a showing of actual prejudice resulting from that breach. Likewise, General Laws Chapter 175, Section 186 provides that material misrepresentations, if made with the actual intent to deceive or those that increase the risk of loss, are the basis for disclaimer by an insurer.

In the instant case, Arbella asserts that the conduct of Theresa Romano in answering questions on her own behalf and on behalf of her sister was misleading and provided false information to Arbella. As such, the insured has breached important conditions of the insurance policy. There are too many vague and unanswered questions that even without the misrepresentations, would be suspicious in this case. Those only cast additional doubt on Miss Romano's credibility.

Dane M. Shulman, Esq.
Law Office of Dane M. Shulman
March 7, 2003
Page 10

For all the above reasons, Arbella hereby disclaims coverage to both of your clients for all losses claimed due to the fire of January 1, 2002. Arbella does not waive any other policy defense not stated herein.

Very truly yours,

Lewis C. Eisenberg

LCE/sas
Enclosures
cc:    Seltzer & Seltzer
       Arbella Mutual Insurance Co.

<u>EXHIBIT A</u>

# COSGROVE, EISENBERG AND KILEY, P.C.
### COUNSELORS AT LAW

MARTIN S. COSGROVE
LEWIS C. EISENBERG
THOMAS R. KILEY
PETER M. McELROY
CARL VALVO

WILLIAM J. CINTOLO
PAUL R. MATTHEWS
THOMAS B. DROHAN
KENNETH W. TERRELL

September 9, 2002

Dane M. Shulman, Esq.
Law Office of Dane M. Shulman
25 Newport Avenue Extension
North Quincy, MA 02171

RE:   **Your Client:**   **LR Blake Trust, Concetta Romano, Trustee**
       **Your Client:**   **Theresa Romano**
       **Arbella Claim No.:**   **000212762 / Insured: Concetta Romano**
       **Arbella Claim No.:**   **000213645 / Insured: Theresa Romano**
       **Loss Location:**   **49 Bowdoin Avenue, Dorchester, MA**
       **Date of Loss:**   **January 1, 2002**
       **Our File No.:**   **arb210772**

Dear Attorney Shulman:

Under separate cover I forwarded to you the copy of the examination under oath of Theresa Romano. I would like to bring several issues to your attention.

As you know, Arbella is currently undertaking an investigation of the circumstances of the fire of January 1, 2002. There are several open items that need to be addressed.

Theresa Romano had executed an authorization for the release of records of Carney Hospital to Paul Mahoney, an independent investigator retained by Arbella. This issue was addressed briefly at the time of the examination under oath of Theresa Romano on July 24, 2002. I have been awaiting those records. I have recently learned from Mr. Mahoney that Theresa Romano has notified the Carney Hospital and has instructed them not to release any medical records until she further authorizes the same.

Although I have no independent verification of the same, Mr. Mahoney has assured me that this is what he was told by the Carney Hospital and that the hospital has indicated that it will get in touch with your client to be assured that it is acceptable to send out the records. To date, there has been no response. To avoid any confusion in this regard, I am enclosing another medical authorization for executing by Theresa Romano. The authorization seeks the records of January 1, 2002 of the emergency room at the Carney Hospital for her care and treatment. These records (including time of arrival and departure) are relevant to the claim that has been made by your clients. I would encourage you to have your client execute the authorization and to return it to me as soon as possible. This is part of the ongoing investigation of Arbella into the circumstances of this fire.

Dane M. Shulman, Esq.
Law Office of Dane M. Shulman
September 9, 2002
Page Two

In the listing of documents to be brought by Theresa Romano and Concetta Romano to their examinations, some of the utility bills were sought (see paragraph 4). During the examination your client agreed to produce the utility bills if further requested (see paragraph 57). I am requesting that Theresa Romano make the necessary arrangements to produce the gas, water, telephone and electric bills for the 3 years leading up to the date of the fire for 49 Bowdoin Avenue, Boston.

Finally, there is the issue of financial information concerning both Concetta Romano and Theresa Romano. These are contained in paragraph 7 and 8 to both examinations under oath. At the time of the examination, your client was instructed not to give any information concerning financial records other than to state that they do have bank accounts (see page 60).

Demand is hereby made for cooperation by both Theresa Romano and Concetta Romano for the production of these records. Where Theresa Romano has a durable power of attorney for her sister, I assume that she is the custodian of the accounts for her sister. In fact, she testified that the accounts of Concetta Romano are joint accounts.

The production of financial information in this investigation is important to Arbella. Accordingly, pursuant to the provisions of the insurance policy for each of your clients, cooperation is required. This cooperation includes the production of relevant financial information. Accordingly, I would encourage you to provide me with the financial information as requested in paragraphs 7 and 8 of Schedule A to both listing of documents for the examinations under oath. Additionally, Arbella demands copies of personal tax returns for both Theresa Romano and Concetta Romano for calendar years 1999, 2000 and 2001.

Recently, Peter Seltser has notified Arbella that he is of the opinion that Arbella is not conducting its handling of this matter in good faith. Arbella disputes the same. Furthermore, the information that has been requested is relevant to the investigation which has been undertaken and which is ongoing. Finally, I do not intend to address the issues of this case on two fronts and will expect to address the legal issues with your office. Please instruct Mr. Seltser to refrain from calling my office and leaving messages. I will not be responding to his demands in light of his messages and the contents of his correspondence.

Very truly yours,

Lewis C. Eisenberg

LCE/sas
cc:    Arbella Mutual Insurance Co.
       Mr. Peter Seltser

**EXHIBIT B**

# COSGROVE, EISENBERG AND KILEY, P.C.
## COUNSELORS AT LAW

MARTIN S. COSGROVE
LEWIS C. EISENBERG
THOMAS R. KILEY
PETER M. McELROY
CARL VALVO

WILLIAM J. CINTOLO
PAUL R. MATTHEWS
THOMAS B. DROHAN
KENNETH W. TERRELL

October 1, 2002

Dane M. Shulman, Esq.
Law Office of Dane M. Shulman
25 Newport Avenue Extension
North Quincy, MA 02171

RE:  **Your Client:**     **LR Blake Trust, Concetta Romano, Trustee**
     **Your Client:**     **Theresa Romano**
     **Arbella Claim No.:**  **000212762 / Insured: Concetta Romano**
     **Arbella Claim No.:**  **000213645 / Insured: Theresa Romano**
     **Loss Location:**    **49 Bowdoin Avenue, Dorchester, MA**
     **Date of Loss:**     **January 1, 2002**
     **Our File No.:**     **arb210772**

Dear Attorney Shulman:

This letter will acknowledge your voice message to my office of September 17, 2002.

In the letter that I sent you of September 9, I requested a medical authorization limited to January 1, 2002 regarding the care and treatment that Theresa Romano received at Carney Hospital on that date. These records had already been requested by Paul Mahoney, an independent investigator retained by Arbella, and authorization was signed by your client. As I referenced in my letter of September 9, I do not know why his request was not honored, but I have been informed that Carney Hospital put some hold on that request in light of some communication from your client.

The securing of these records are material and relevant to the investigation of Arbella. Ms. Romano has a duty to cooperate with her insurer in providing this information. This is not only a statutory condition, but is a condition of the insurance policy as well.

In your voice message you indicated that Ms. Romano would provide an authorization, but would only limit it to any medical treatment of January 1, 2002. That is exactly what I have requested in my letter along with the attachment (medical authorization), another copy of which is enclosed.

Dane M. Shulman, Esq.
Law Office of Dane M. Shulman
October 1, 2002
Page Two

We have also requested financial information of your client. When she refused to provide such information based upon your objection during the time of the examination, I followed that matter with my letter of September 9. In that letter I once again requested financial information. From your voice message of September 17, I understand that your client will not provide any financial information to Arbella. If that is the case, please confirm in writing with me. Again, I think this is a matter of cooperation required by your client and would urge you to provide the information that has been requested.

With regard to your comment about commencing a lawsuit, no response is required. I trust that you are aware that Mr. Seltzer has requested a reference pursuant to G.L. 175, §99, et seq. Arbella has responded to that request.

Very truly yours,

Lewis C. Eisenberg

LCE/jtl
Enclosure
cc:    Arbella Protection Insurance Co.



## RECORDED INTERVIEW

Okay, the tape recorder is now on. The time is 1:07 p.m. Today is Tuesday, April 2nd, 2002. This is Paul Mahoney from Gallagher, Mahoney & Associates speaking. I am conducting a tape-recorded interview today with Ms. Theresa Romano. This is in regards to the January 1st, 2002 fire loss, which occurred at 49 Bowdoin Avenue in Dorchester, Massachusetts. This interview is being conducted today at the law offices of Dane M. Shulman at 1596 Blue Hill Avenue in Mattapan, Mass. Ms. Romano is represented today by Attorney Jeffrey Rosenberg and by Attorney Dane Shulman. This interview is being conducted as part of the investigation into the fire loss, and Arbella Insurance Company reserves its right to conduct an examination under oath if it decides to do so in the future. This is an Arbella Insurance Company claim, number 000213645, and it's Gallagher, Mahoney & Associates file number 02-0269.

PM.    Ms. Romano, are you aware that I'm tape-recording this interview?

TR.    Yes, I am, Mr. Mahoney.

PM.    Okay. And do I have your consent to do so?

TR.    Yes, you do.

PM.    Okay. Present also, as I mentioned, was Attorney Jeffrey Rosenberg. Jeff, would you introduce yourself for the tape, please?

JR.    Attorney Jeffrey Rosenberg.

PM.    Okay. And Mr. Shulman, could you also introduce yourself?

DS.    My name is Attorney Dane M. Shulman.

PM.    Okay. Just turn the recorder off, make sure everything's working.

[Tape is stopped and restarted.]

PM.    All right. The tape recorder is now back on. It's 1:10 p.m. Ms. Romano, if you could start, please, by stating your full name.

TR.    Yes. My name is Theresa M. Romano.

PM.    Okay. Does the M stand for a name?

1

TR.    Marion, sorry.

PM.    Marion?  Okay.  And have you ever been known by any other name?

TR.    No.

PM.    Have you ever been married?

[No audible response.]

PM.    Okay.  And what's your date of birth?

TR.    4 – 1 – 32.

PM.    And your Social Security number?

TR.    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.

PM.    And what is your current home address?

TR.    I'm living at 9 Amherst Street, Nashua, New Hampshire.

PM.    And how long have you lived at that address?

TR.    I go there, you know, from Dorchester.  I should say lived there.  I mean, I...that's
       a second home.

PM.    Okay.  And is that your permanent residence presently?

TR.    No.  Well, I'm living there because that's...I don't have the house in Dorchester
       any more...

PM.    Okay.

TR.    ...to live in.

PM.    All right.  So how long have you lived at 9 Amherst Street on a regular basis—on
       a permanent basis?

TR.    Since January 1st...

PM.    And...

TR.    ...'02.

PM.    And prior to January 1st, what was your home address?

TR.    49 Bowdoin Avenue, Dorchester, Mass., 02122.

PM.    And how long had you lived at 49 Bowdoin Avenue?

TR.    Sixty-one years.

PM.    Okay. Are you currently employed?

TR.    No.

PM.    How long have you been unemployed?

TR.    What do you mean by unemployed? I don't understand.

JR.    When was the last time you worked—what year?

TR.    8 – 19...I mean, sorry. 1982, I have to remember.

PM.    '82?

TR.    Yes.

PM.    Okay. And it...are you retired?

TR.    No, I'm disabled. I'm considered disabled.

PM.    Okay. And...and what did you do at the time you became disabled?

TR.    I was a special education teacher. Boston Public Schools.

PM.    Okay. Did...did you work at one particular school?

TR.    Yes.

PM.    Okay, which school was that?

TR.    That was the Holland.

PM.    Okay. And do you receive a pension—a disability?

3

TR.   Yes, I do.

PM.   Okay. And how much is that?

TR.   That's forty-two thousand a year.

PM.   Is that from the City of Boston?

TR.   Yes, it is.

PM.   Okay. Besides the forty-two thousand a year from the City of Boston, do you have any other source of income?

TR.   Yes, I do.

PM.   Okay. And what would that be?

TR.   Well, I have savings.

PM.   Okay. A regular savings account at a...at a bank?

TR.   Well, I have saving[sic] account at a bank. I have...I...I have all mutual funds. I have different... What do you want to know?

PM.   Savings, you have...you have investments?

TR.   Yes.

PM.   Okay. And where do you have those accounts?

DS.   I'm gonna stop you. I don't think that that's something that you should be interested in, where she has those accounts.

PM.   Okay.

DS.   So I'll tell her not to respond to that question.

PM.   Okay. Approximately how much do you have in those savings accounts?

TR.   Do I ?.

DS.   You can give him an approximation, that's all right.

4

TR.   I...I really haven't even thought about it.  I have sufficient to...  I don't know what to say.

PM.   Okay.

TR.   You want me to...

DS.   Well, if you don't know the exact amount, say so.

TR.   I don't.

PM.   Okay.  Do you draw on those funds on a regular basis?  Weekly, monthly?

TR.   I don't have to.

PM.   Do you draw on those funds though?

TR.   Well, I mean to pay bills, yes.  I mean, do you mean if I didn't have them, could I live?

PM.   No.

TR.   Oh.

PM.   I just asked you if...if you drew on those accounts on a regular basis.

TR.   Well, I...I have accounts and I use them when I need them...

PM.   Okay.

TR.   ...to pay bills and whatever.

PM.   Okay.  All right.  And besides your savings account and the forty-two thousand a year from the City of Boston, do you have any other sources of income?

TR.   Well, I don't...when you...what do you mean?

PM.   Do you have any part-time jobs at all?

TR.   No.

PM.   Okay.  Do you...rent your properties out to anyone?  Are you a landlord?

5